```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )  3:08-CR-00167-B-1
                          )
COREY DEYON DUFFEY,       )
                          )
          Defendant.      )
```

### RESENTENCING HEARING
### BEFORE THE HONORABLE JANE J. BOYLE
### UNITED STATES DISTRICT JUDGE
### MARCH 2, 2022

A P P E A R A N C E S

For the Government:

```
    UNITED STATES ATTORNEY'S OFFICE
    1100 Commerce Street - 3rd Floor
    Dallas, TX  75242
    214/659-8600
    BY:  AMY J. MITCHELL
         GARY TROMBLAY
```

For the Defendant:

```
    HUNTER, LANE & JAMPALA
    310 S St Mary's St - Suite 1740
    San Antonio, TX 78205
    210/202-1076
    BY:  JOHN TORREY HUNTER
         VIVEK JAMPALA
and
    FLANARY LAW FIRM, PLLC
    One International Center
    100 NE Loop 410 - Suite 650
    San Antonio, TX  78216
    210/738-8383
    BY:  DONALD HERBERT FLANARY, III
```

```
COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242

Proceedings reported by mechanical stenography,
transcript produced by computer.
```

```
 1                    (In open court at 10:00 a.m.)
 2              THE COURT:  Good morning.  This is
 3    Case Number 3:08-CR-167.  Seen you many times
 4    before.  We've got a sentencing in United States v.
 5    Corey Deyon Duffey.  We're going do a re-sentencing
 6    today.
 7              Who is here for the Government?
 8              MS. MITCHELL:  Amy Mitchell.
 9              THE COURT:  Take your mask off, please.
10              MS. MITCHELL:  Amy Mitchell and Gary
11    Tromblay for the Government.
12              THE COURT:  Mr. Tromblay, you are back.
13              MR. TROMBLAY:  I am back.
14              THE COURT:  Ms. Mitchell, nice to see you.
15    Haven't seen you for a while.
16              And for the defense?
17              MR. JAMPALA:  Your Honor --
18              THE COURT:  Stand up, please.
19              MR. JAMPALA:  Your Honor, my name is Vivek
20    Jampala.  And this is --
21              THE COURT:  No, no.  Last name?
22              MR. JAMPALA:  Jampala.
23              THE COURT:  Spell it for me.
24              MR. JAMPALA:  J-A-M-P-A-L-A.
25              THE COURT:  I've got to get that right.
```

```
 1   Jampala.  Okay.
 2              MR. JAMPALA:  And this is Mr. John Hunter.
 3              MR. HUNTER:  Good morning, Your Honor.
 4   John Hunter for Mr. Duffey.
 5              THE COURT:  Speak into the microphone, and
 6   take your mask off, please.
 7              MR. HUNTER:  Good morning, Your Honor.
 8   John Hunter for Mr. Duffey.
 9              THE COURT:  Mr. Jumpala and Mr. Hunter,
10   and Mr. Duffey is here.
11              THE DEFENDANT:  Yes, ma'am.
12              MR. FLANARY:  And Don Flanary, Your Honor.
13              THE COURT:  Don what?
14              MR. FLANARY:  Flanary.
15              THE COURT:  Flanary.  Okay.  We have --
16   this is a big team of a defense.
17              Okay.  All right.  If you-all could bring
18   Mr. Duffey up here.
19              Good morning, Mr. Duffey.
20              THE DEFENDANT:  Good morning, Your Honor.
21              THE COURT:  How are you?
22              THE DEFENDANT:  I'm all right.
23              THE COURT:  It's been a while.
24              THE DEFENDANT:  Yes, it has.
25              THE COURT:  I'm going to ask you lots of
```

1    questions about the sentencing papers to make sure

2    you have them all.  Have you looked at them all with

3    your attorney, Mr. Jampala -- right?

4                MR. JAMPALA:  Yes, ma'am.

5                THE COURT:  Okay.  And I want to place you

6    under oath before I do that.

7                Could you sit down, sir, in the back?

8                (Discussion held off the record.)

9                THE COURT:  Raise your right hand, please.

10               (The Defendant was sworn.)

11               THE DEFENDANT:  Yes, Your Honor, I do.

12               THE COURT:  And speak up when you talk to

13   me.

14               Okay, we're going to go through all these

15   papers.

16               Now, I don't need to go through the

17   initial ones -- or have you looked at them all?

18   Have you looked at everything in the sentencing

19   record up till this sentencing --

20               THE DEFENDANT:  Yes, Your Honor I have.

21               THE COURT:  -- with Mr. Jampala?

22               Okay.  I'm going to start with the second

23   addendum to the presentence report.

24               Have you read through that paragraph by

25   paragraph, page by page, with Mr. Jampala before

1  today?

2         THE DEFENDANT:  Yes, Your Honor, I have.

3         THE COURT:  Do you understand the second

4  addendum?

5         THE DEFENDANT:  Yes, I understand.

6         THE COURT:  Any questions about it?

7         THE DEFENDANT:  No, Your Honor.

8         THE COURT:  Okay.  Then I have the third

9  addendum to the PSR, and I will ask you the same

10  questions.

11         Have you read through this paragraph by

12  paragraph, line by line with your attorney,

13  Mr. Jampala?

14         THE DEFENDANT:  Yes, Your Honor, I have.

15         THE COURT:  Any questions about it?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  Okay.  And then the Government

18  accepted the PSR in Document 697.  They just

19  accepted it.

20         Then I have a letter -- but I think it's

21  followed up by a motion or something -- that you

22  say -- you're writing to Mr. Lujan, who is the

23  probation officer, a very nice, lengthy letter about

24  why you think the First Step Act applies to this

25  proceeding.

```
 1                  Is that right, Mr. Lujan?

 2                  Mr. -- I'm sorry.  Yes, sir.  Is it right.

 3                  MR. JAMPALA:  Yes, Your Honor.

 4                  THE COURT:  Has Mr. Duffey read it over.

 5                  MR. JAMPALA:  He has, Your Honor.

 6                  THE COURT:  Mr. Duffey, have you read over

 7      the letter of October the 28th, nineteen- -- I mean

 8      2021 with Mr. Jampala.

 9                  THE DEFENDANT:  Yes, I do.

10                  THE COURT:  Do you understand all the

11      contents of it?

12                  THE DEFENDANT:  Yes, I do.

13                  THE COURT:  Anything you disagree with?

14                  THE DEFENDANT:  No, Your Honor.

15                  THE COURT:  Okay.  And then I have the

16      fourth addendum.

17                  Have you read over this carefully with

18      Mr. Jampala, paragraph by paragraph, page by page

19      before today?

20                  MR. JAMPALA:  Your Honor, I was on the

21      phone with Mr. Duffey.  We were not in personal

22      contact because there was a Covid issue at the jail.

23      But I did go over that document with him.

24                  THE COURT:  With him.

25                  MR. JAMPALA:  Um-hum.
```

```
1              THE COURT:  Okay.  Did you go over it with

2     Mr. Jampala -- do you agree -- by phone?

3              THE DEFENDANT:  Yes, we discussed it on

4     the phone.  Yes, Your Honor.

5              THE COURT:  And you understand all the

6     provisions of it or do you need a second to go over

7     them?  It's okay if you do.

8              THE DEFENDANT:  I understand.  He

9     explained it to me in detail.

10             THE COURT:  Okay.  Okay.  Mr. Jampala, do

11    you agree with that?

12             MR. JAMPALA:  I do, Your Honor.

13             THE COURT:  All right.  Any questions

14    about it?

15             THE DEFENDANT:  No, Your Honor.

16             THE COURT:  Then I have the sentencing

17    memorandum, Document 720, and with all the

18    certificates and all the letters -- certificates and

19    all the attachments, I read through all the

20    attachments.

21             Have you read through Document 720

22    thoroughly with Mr. Jampala?

23             THE DEFENDANT:  Yes, Your Honor, I have.

24             THE COURT:  Do you understand it?

25             THE DEFENDANT:  Yes, I understand.
```

```
 1              THE COURT:  Any question about it?
 2              THE DEFENDANT:  No, Your Honor.
 3              THE COURT:  Mr. Jampala, do you agree with
 4    that?
 5              MR. JAMPALA:  I agree with that, Your
 6    Honor.
 7              THE COURT:  Then I have Document 730,
 8    which is the Government's response to Duffey PSR's
 9    objections.
10              Look at that.  Have you read through that
11    carefully with Mr. Jampala before today?
12              THE DEFENDANT:  Yes, Your Honor.
13              THE COURT:  Paragraph by paragraph?
14              THE DEFENDANT:  Yes, Your Honor.
15              THE COURT:  Any questions about it?
16              THE DEFENDANT:  No, Your Honor.
17              THE COURT:  Then I have many letters.  I
18    mean, I've read them all, but there are lots of
19    letters here for you, and I'm sure you are familiar
20    with that, correct?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  And there's more letters, and
23    that's all.
24              Should I have anything more than that?
25              MR. JAMPALA:  I believe that's everything,
```

10

```
1   Your Honor.
2             THE COURT:  Okay.  Anything from the
3   Government I should have?
4             MS. MITCHELL:  That's everything, Your
5   Honor.
6             THE COURT:  Thank you.  Be sure to speak
7   into the mic.  I'm so picky about that.  Okay.
8             Then I have his disciplinary record.
9             Do you have his disciplinary record?
10            MR. JAMPALA:  I do, Your Honor.
11            THE COURT:  Have you looked at your
12   disciplinary record?
13            THE DEFENDANT:  Yes, ma'am, I have.
14            THE COURT:  I know you contest some of
15   them, but I want to make sure you've read it over.
16            THE DEFENDANT:  Yes, I have.
17            THE COURT:  Mr. Duffey, you can take a
18   seat for right now because we have some legal issues
19   to take up.
20            And who is going to argue, Mr. Jampala,
21   the First Step Act application to this sentencing?
22            MR. JAMPALA:  That would be me, Your
23   Honor.  I will be taking up that objection, as well
24   as the question about restraint.
25            THE COURT:  Yeah, okay.
```

1          MR. JAMPALA:  And Mr. Hunter will be

2    handling the rest of the objections.

3          THE COURT:  Great.  Go ahead.

4          MR. JAMPALA:  Regarding the First Step

5    Act, it's our contention that this is an issue of

6    what constitutes a valid sentence, and when Congress

7    passed the First Step Act, what they intended as far

8    as its retroactivity was regarding valid sentences

9    and not merely any sentence.

10          The Government does cite to *United States*

11    *v. Gomez* from the 5th Circuit 2020.  And we think

12    that that is not completely on point, because it

13    does very much hinge upon the idea of when a

14    sentence is imposed.

15          It's not our contention that there's some

16    temporal aspect of the sentencing that makes it --

17          THE COURT:  What -- what do you mean by

18    that?

19          MR. JAMPALA:  That there is something

20    wrong with the dates or that his original sentences

21    happened prior.  Our contention is that those are

22    not valid sentences at all, and therefore should not

23    be considered.

24          THE COURT:  Now, do you have any cases

25    right on point?

 1            MR. JAMPALA:  Not from the 5th Circuit,

 2    Your Honor.  But the case cited by the Government,

 3    *United States v. Jackson*, does compare and contrast

 4    their reasoning with the 4th Circuit's reasoning.

 5    Both of these are from the 6th and 4th --

 6            THE COURT:  Tell me about those cases.

 7            MR. JAMPALA:  Sure.

 8            *Jackson*, the -- it is from the 6th Circuit

 9    Court of Appeals, and it was just decided in April

10    of this year -- sorry, of last year, excuse me.

11            And the Court decided that the exact

12    language -- excuse me, let me pull it up -- of the

13    First Step Act, I believe it's 403(b), Applicability

14    to Pending Cases.

15            And it states:  "This section and the

16    amendments made by this section shall apply to any

17    offenses that was committed before the date of

18    enactment of this act if a sentence for the offense

19    has not been imposed as of such date of enactment."

20            And it was enacted December 21st of 2018.

21            And, essentially, we are basically

22    fighting over a term.  If a sentence for the offense

23    has not been imposed.  And like I said, the word

24    "imposed" is not really in question, it's really a

25    question of what does "a sentence" mean?

1            And regarding this, *Jackson* basically says

2     that "a sentence" means at the date of

3     December 21st, the date of enactment, does the

4     defendant have a sentence?

5            And they go through and they do cite

6     *Black's Law Dictionary* and *The Chicago Manual of*

7     *Style* to -- or to reiterate that the tense of the

8     verb should apply.  And this is them quoting from

9     *Chicago Manual of Style*.

10           THE COURT:  Slow down.  Slow down, because

11    you read faster than you talk.

12           MR. JAMPALA:  I'm a nervous reader, Your

13    Honor.

14           THE COURT:  I am, too.  I talk fast.

15           MR. JAMPALA:  This is from *Jackson*.  And I

16    think this is roughly the holding in their --

17           THE COURT:  What circuit was that?

18    Fourth?

19           MR. JAMPALA:  Sixth.

20           "In arguing to the contrary, *Jackson*

21    contends that there was -- that when his sentence

22    was vacated 'his sentence was rescinded, and there

23    was no longer a sentence imposed upon him until he

24    was resentenced.'  That argument misconstrues the

25    First Step Act's retroactivity inquiry.  That

14

```
 1    Jackson was without a sentence for three months in
 2    2019 does not change the fact that as of
 3    December 21, 2018, a sentence had been imposed upon
 4    him.  After all, vacatur does not erase Jackson's
 5    prior sentence from history.  Vacatur merely 'makes
 6    void' the thing vacated."
 7              And they cite the definition of "Vacate"
 8    from Black's Law Dictionary.
 9              "When that thing becomes void, it is 'of
10    no legal effect' anymore."
11              And they cite the definition of "Void"
12    from Black's Law Dictionary.
13              "But eliminating a sentence's prospective
14    legal effect only 'wipes the slate clean' looking
15    forward."  Citing to Pepper v. United States from
16    United States Supreme Court --
17              THE COURT:  Slow down.  Pepper v. United
18    States.
19              MR. JAMPALA:  Yes, and I will give the
20    full citation, I apologize.
21              THE COURT:  That's okay.
22              MR. JAMPALA:  562 U.S. 476 at page 507,
23    and that's from 2011.
24              THE COURT:  In that case, did they apply
25    the First Step Act in the manner that you are
```

```
 1   requesting?

 2            MR. JAMPALA:  In Pepper or --

 3            THE COURT:  In either one.

 4            MR. JAMPALA:  In Jackson, no.  But right

 5   below that they discuss -- they -- which is their

 6   sister court's -- 4th Circuit -- decision that goes

 7   the other way.

 8            THE COURT:  Tell me about that.

 9            Tell me about the only decision you have

10   that goes this way.

11            MR. JAMPALA:  Well, let me -- I apologize.

12            THE COURT:  That's okay.  Take your time.

13            I appreciate -- you know, I appreciate the

14   time.

15            MR. JAMPALA:  Regarding the "they," I

16   am -- I don't think I have a report citation, but

17   it's United States v. Bethea, Number 19-4618 at page

18   11.  This is from the Fourth --

19            THE COURT:  What circuit was that?

20            MR. JAMPALA:  Fourth Circuit 2021.

21            THE COURT:  And did they apply the First

22   Step Act in the manner you're suggesting?

23            MR. JAMPALA:  Yes, they did.

24            THE COURT:  So tell me about that case.

25   Tell me what the facts were.
```

```
 1            MR. JAMPALA:  Let me . . . this was not
 2    necessarily a 924(c) issue.  It was regarding the
 3    First Step Act's Amendment to 841.  But they do
 4    discuss vacatur, specifically in the context of
 5    having a 2255, I believe.
 6            And I'll just quote what I believe is the
 7    proper section here.
 8            "In this case, the district court's
 9    vacatur and reentry of judgment nullified Bethea's
10    original sentence such that a sentence cannot
11    legally -- cannot legally be said to have been
12    imposed until 2019.  As this Court explained in
13    United States v. Hadden, 2255 contemplates specific
14    types of remedies in a criminal judgment -- if a
15    criminal judgment is infirm."
16            And the citation is 475 F.3d 652 at 667 to
17    668 in 2007.
18            Quoting from that:  "The end result --"
19            THE COURT:  Slow down.
20            MR. JAMPALA:  Sorry.
21            "'The end result of a successful 2255
22    proceeding must be the vacatur' of a sentence
23    followed by a remedy (1) granting release; (2)
24    granting a new trial, or (3) granting a 'new
25    sentence, be it imposed by (a) a resentencing or (b)
```

```
 1   a corrected sentence.'"

 2           "A corrected sentence 'is an entirely new

 3   sentence,' which permits a direct appeal from its

 4   imposition as part of the individual's original,

 5   criminal case."

 6           And they cite back to the same case at

 7   664.

 8           "And a 'new' sentence is imposed by

 9   correction even if that correction merely changes

10   the date to permit appeal."

11           And they go on to explain their reasoning

12   a little bit more.

13           THE COURT:  No, that's okay.  That's okay.

14   All right.  Just tell me else you have besides those

15   cases.

16           MR. JAMPALA:  Those are the, I -- I think

17   the two most developed cases on the issue that

18   directly talk about the types of, I guess,

19   interpretation as regarding retroactivity and the

20   question of what constitutes a sentence, whether it

21   is merely a valid sentence or any sentence that is a

22   historical fact.

23           I think that the 4th Circuit is correct on

24   this, because it is often the case in a courtroom,

25   especially in a criminal context, that we do not
```

1  deal necessarily with historical facts.  We deal

2  with legal facts.

3          I think the 4th Amendment jurisprudence is

4  the exclusionary rules are completely based on this.

5  We do not use facts that, even though they may be

6  true and historically true, but they maybe run afoul

7  of the law and we toss those facts out.  And we have

8  a legal fact that this individual did not find --

9  the officer did not find any contraband or a

10 confession was not found to be lawfully received

11 from the defendant, and, therefore, there was no

12 confession at all.

13         And this also happens in the context of

14 being able to deny an arrest happened.  It happens

15 after expunction.  It happens -- I'm unsure about

16 this, but I believe a presidential pardon has

17 certain effects of altering historical facts and

18 having the legal fact be different.

19         THE COURT:  Okay.  Anything else?

20         MR. JAMPALA:  I will say the use of the

21 words of the First Step Act, I do believe, are

22 important.

23         Convictions and sentences are overturned

24 all the time, and they can be overturned on direct

25 appeal or by writ.

```
 1              And Congress, if they did want to have a
 2    firm date anchored to historical facts, could have
 3    used the factual basis as the anchoring date, which
 4    they chose not to do.  They could have used the date
 5    of the indictment, which was served as a basis of
 6    conviction to also serve as a date, the date that
 7    the indictment came down, which is also fixed.  And
 8    barring a motion to quash at the (inaudible) level,
 9    stays in place.
10              As opposed to doing that, they chose the
11    word, "a sentence."  And sentences -- the date of
12    that sentence and resentencing, as you know, we are
13    here for the third time historically, first time
14    legally.
15              THE COURT:  Well, the first time wasn't my
16    fault.  The second time I don't think was my fault.
17    I don't know.  I just think the law has changed.
18              Okay.  Anything else?
19              MR. JAMPALA:  Regarding this issue, I will
20    say, Your Honor, I believe *Jackson* is actually
21    pending cert in the Supreme Court.  I think by this
22    Friday, they should have a decision as to whether or
23    not they want to pick that up.  But either way, I do
24    think there is a circuit split, if not a developing
25    circuit split.
```

```
 1                    I do want to make the Court aware that I
 2      believe the "they" is unpublished, but it is treated
 3      with -- well, the opinion, itself, has a great deal
 4      of analysis.  And the 6th Circuit seems to treat it
 5      with the intellectual rigor, which I believe it
 6      deserves.
 7                    THE COURT:  Thank you, Mr. Jampala.
 8                    I would like to hear from Ms. Mitchell.
 9                    Be sure to talk into the mic.
10                    MS. MITCHELL:  The first thing I would
11      like to say is, I would confirm that Bethea is an
12      unpublished decision.  It was a --
13                    THE COURT:  What decision was that?
14                    MS. MITCHELL:  Bethea.
15                    THE COURT:  Okay.  And where was that out
16      of?
17                    MS. MITCHELL:  That is the 4th Circuit.
18                    It is unpublished, and it is a two-one
19      decision.  And the dissent on that case actually
20      falls on the side of the Jackson case.
21                    And also Jackson, last time I checked, it
22      was also -- I believe it is also pending cert.
23      Perhaps it is a developing circuit split, but it is
24      not one yet, because there's no published decision
25      out of the 4th Circuit that goes the other way.
```

21

1    It -- because it's unpublished.

2              As to the underlying argument, the

3    5th Circuit has drawn the same line as the

4    11th Circuit and the 6th Circuit, and that line is

5    the date of enactment.

6              THE COURT:  What do you mean the date of

7    enactment?

8              MS. MITCHELL:  The date of enactment for

9    the amendment.  I'm sorry.

10             THE COURT:  Okay.

11             MS. MITCHELL:  So the First Step Act

12   Amendment went into effect December 21st, 2018.  And

13   as of that date, Mr. Duffey was serving a valid

14   sentence.  This Court's sentence was imposed first

15   in 2010, and the second resentencing was in 2012.

16             He was serving that sentence on the day of

17   enactment.  And that is the date that the

18   5th Circuit looked at in *Gomez*.  That's the date

19   that the 6th Circuit looked at in *Jackson*.  It's the

20   date that the 11th Circuit looked at in *Smith*.

21   Which the *Smith* case is the one I referenced in my

22   response to the defendant's objections.

23             So it's the Government's position that the

24   best reading of the statutory -- or the amendment's

25   language, itself, is that, was there a valid

22

```
1   sentence on the date of enactment, and if there was,

2   the amendment does not apply.

3           So it's our position that the subsequent

4   924(c)'s should continue to be 25 years.

5           THE COURT:  Okay.  Thank you very much,

6   Ms. Mitchell.

7           MS. MITCHELL:  Thank you.

8           THE COURT:  Okay.  I think I have heard

9   enough about this, unless you have something else,

10  Mr. Jampala, but I would like to rule.

11          Mr. Jampala, are you ready?

12          MR. JAMPALA:  Ready, Your Honor.

13          THE COURT:  You know, I think you make an

14  interesting argument.  And if this becomes a circuit

15  split, we will deal with it at that time.  But I

16  don't think it is a circuit split, and I am very

17  convinced that the date of enactment out of the 5th

18  Circuit and the 11th Circuit are the correct dates.

19          I don't see how someone can't be serving a

20  sentence when they are serving a sentence.  And I

21  think that Probation dealt with this very well in

22  the fourth addendum.  And, you know, you can read

23  into it what you like, but I -- on page 2 of the

24  presentence report, they give a nice analysis.

25          The First Step Act was enacted on
```

```
1   December 21st, 2018, as Ms. Mitchell has pointed

2   out, at which time the defendant was serving a

3   sentence of imprisonment imposed by the Court.

4   Therefore, the amendment to 924(c) is not

5   retroactive to this case.  And as such, the

6   mandatory minimum sentences for 27, 31, 35 and 39 is

7   25 years or 300 months.

8              So I also think the Government's response

9   has some good language in there, and I adopt it, and

10  I'm going to overrule the objection.

11             Okay.  Who's got the next objection?

12             MR. JAMPALA:  Me again, Your Honor.

13             THE COURT:  Okay.

14             MR. JAMPALA:  Regarding the second

15  objection, I believe that has to do with primarily

16  the issue of restraint and the two-point adjustment

17  regarding physical restraint.

18             And the crux of our argument here is that

19  the issue of physical restraint and a gun is always

20  difficult.  But the case law on this, specifically

21  in Garcia, is pretty clear.  Merely because somebody

22  points a gun, even if it is touching another

23  individual, does not necessarily mean that they are

24  confining them or using physical restraint.

25             There's a case here that they do cite
```

1    regarding the 8th Circuit, and I will briefly cite

2    *United States v. Garcia*.

3             THE COURT:  Okay.

4             MR. JAMPALA:  857 F.3d 708, 5th Circuit

5    2017.

6             "In *Stevens*, for example, the 8th Circuit

7    upheld a physical restraint enactment because the

8    defendant 'moved bank employees to two distinct

9    locations at gunpoint and closed them in a vault

10   under circumstances clearly implying they should

11   remain there or risk physical harm.'"

12            I do think moving someone around is the

13   exact opposite of restraint.  I think that much is

14   pretty obvious.  But what -- the difference in

15   *Stevens* in the 8th Circuit, what made that an actual

16   restraint is that moving them around to a vault and

17   then closing that vault door behind them is very

18   much restraining the actions confined to a certain

19   location and also the threat of force if they move

20   from that location implied by the specific facts of

21   that case.

22            I don't believe we have that here.  I

23   believe that merely a bank manager was moved at

24   gunpoint.  And I believe that that is not sufficient

25   to trigger any issue regarding physical restraint.

1          There's a law, the case argument that is
2     made, but I will say that *Garcia* makes this
3     distinction very clear, and it's from 2017.  And
4     it's -- that argument would not have been able to
5     have been made prior to this, as far as the -- that
6     kind of hairline distinction.
7          And I -- I know that the previous
8     objection was overruled.  But I will say, a vacated
9     sentence would put this case on a footing where
10    those objections and the law of the case would not
11    apply.
12         THE COURT:  Thank you, Mr. Jampala.  I'll
13    get used to that.
14         Ms. Mitchell.
15         MS. MITCHELL:  It's the Government's
16    position that this two-level enactment for physical
17    restraint is the law of the case.  This enactment
18    was present in the 2010 PSR.  It was present in the
19    2012 addendum.  It was not challenged at that point.
20    This case has gone through two direct appeals on
21    those sentences, and it is the law of the case.
22         And I think that's even more important
23    here, where the Court's jurisdiction is cabined by
24    this being the outgrowth of a successive 2255.
25         The 5th Circuit authorized the Court to

26

 1   look at the -- the now invalid 924(c)'s and anything
 2   related to that in resentencing.  I think that makes
 3   it sort of more important that this be cabined into
 4   the law of the case.
 5          Secondly, this -- the law was less clear
 6   in 2010 and 2012 than it is now.  The actions that
 7   these defendants took in moving the bank employees
 8   around the bank at gunpoint would be considered
 9   kidnapping, and it would be that four-level
10   enhancement that would apply.
11          The Government isn't asking for that,
12   because it's our position that it's the law of the
13   case, and the two-level enhancement should stay the
14   way that it is.
15          Thank you.
16          THE COURT:  Mr. Jampala, anything else?
17          If you want to speak, come up here,
18   please.
19          MR. HUNTER:  If I could briefly respond,
20   Your Honor.
21          THE COURT:  Yes, absolutely.
22          I don't usually like double-teaming, but I
23   will let you do it.
24          MR. HUNTER:  I appreciate it.  I will be
25   up for the next objection, as well.

```
 1              THE COURT:  Um-hum.
 2              MR. HUNTER:  With respect to the concern
 3    about the law of the case, while I can appreciate
 4    the concept, certainly, I think that we sort of have
 5    to roundabout to the same thematic concern
 6    Mr. Jampala raised when we discussed the First Step
 7    Act.  And that is that the prior outcome, the prior
 8    sentencing in this case -- and certainly I -- I
 9    think the Court did an able well job in both those
10    instances.  As you said, that wasn't your fault, the
11    law just changed.
12              THE COURT:  Yeah.
13              MR. HUNTER:  But those sentences and the
14    underlying rationale behind them have been vacated.
15    And there is a principle there that I think was laid
16    out in I think both of the definitional authorities
17    Mr. Jampala cited to, Your Honor, about what vacatur
18    really means in terms of it being void ab initio,
19    having been voided as though it didn't occur.
20              THE COURT:  But do you have any cases that
21    allow me to consider something like restraint at
22    this stage, the third sentencing?
23              MR. HUNTER:  Well, Your Honor, the
24    question would be based upon --
25              THE COURT:  That's my question, but go
```

1    ahead.

2            MR. HUNTER:  I think, to look at that, we

3    need to look at the rationale that *Bethea* talks

4    about that Mr. Jampala cited to you about the

5    consequences of 2255 relief --

6            THE COURT:  But I just want to know.

7    Before you get into that, do you have any cases

8    right on point?

9            MR. HUNTER:  Directly on point, Your

10   Honor, no, I do not.

11           THE COURT:  Okay.  Go ahead.

12           MR. HUNTER:  What I would suggest to you

13   is that the underlying rationale in *Bethea* is on

14   point in the sense that overarching all of this, we

15   are here before you today because 2255 relief was

16   granted.  And in that 2255 relief, the sentences

17   were vacated.  The convictions that were subject to

18   the Davis analysis were vacated, so we begin with a

19   clean slate.

20           So why should we presume that we proceed

21   with a clean slate, but then the law of the case

22   would require us to have to be bound by the

23   objections and the decisions of trial counsel in

24   those original proceedings.

25           To me, that -- that would be great

```
 1   difficulty, because the -- there are lots of things

 2   that have advanced and developed.  I mean, certainly

 3   this was a case that was calculated on the 2008

 4   guidelines.  The manual has been updated.  The

 5   commentary and the practice advisory notes for the

 6   manual continue to get added to.  And of course

 7   there's a bevy of new decision-making every year.

 8           I think what we can glean from the

 9   decision-making that's been put forward about

10   restraint is that there has been considerable

11   discussion of it.  And the Court has acknowledged

12   there is a definitional component of things that

13   might look like restraint in the sense they are

14   violent, they are scary, but they don't meet the

15   legal standard of what restraint really means under

16   the guidelines.

17           I would find it hard to believe that the

18   Court would be bound by that decision now if, in

19   fact, vacatur really is what it purports to be and

20   that we have a new chance for a sentencing here.

21           THE COURT:  Thank you very much.

22           Ms. Mitchell.

23           MS. MITCHELL:  I think I would just

24   reiterate what I said about these were not

25   previously challenged.  The facts underlying this
```

```
 1   have not changed.  You know, the facts, as they were
 2   set out in the PSR and that you heard at trial,
 3   haven't changed since 2010 when this case was first
 4   sentenced.
 5            The fact that it was never challenged
 6   before, the fact that it's been through two previous
 7   5th Circuit appeals on sentencing specifically, it
 8   is the law of the case.  And even if the Court were
 9   to reconsider it now, as I said, I think there is a
10   very strong argument this would be kidnapping if
11   this was sentenced as a clean slate today, and it
12   would be four-level enhancement.
13            THE COURT:  Okay.  Thank you.
14            MR. JAMPALA:  One other thing.
15            THE COURT:  Come on up.
16            MR. JAMPALA:  You asked about, you know,
17   decision-making on point.  And while the facts of
18   this case have not changed, the law has, in fact,
19   progressed since that first 2008 sentence was
20   imposed.
21            In 2017, United States v. Garcia was
22   decided, which is a 5th Circuit case.  We cite to
23   this in our briefing.  So there has been a material
24   change in the law that the Court did not have the
25   benefit of when it imposed that original sentence.
```

```
 1              THE COURT:  Does it say the facts here
 2   would not be restraint?
 3              MR. JAMPALA:  Well, the premise of Garcia
 4   is that -- that just simply the fact that use of a
 5   gun and brandishment of a gun might have been used
 6   to physically restrain someone doesn't actually mean
 7   it actually meets the enhancement requirements.
 8   It's a restriction of freedom of movement.
 9              So the Court in Garcia stated, "We
10   concluded that merely brandishing a weapon --"
11              THE COURT:  Slow down, just because you're
12   reading.
13              MR. JAMPALA:  Sorry, Your Honor.  I'm an
14   old debater, and, regrettably, they always rewarded
15   us for talking so fast.
16              THE COURT:  I know.  I watched some
17   debates and wondered why they talked so fast.
18              MR. HUNTER:  It's madness.  It's a perfect
19   example of an ant that branches off from the main
20   group and forms a circle with the rest of the people
21   behind it.
22              "Yet, we concluded that merely brandishing
23   a weapon at a victim cannot support an enhancement
24   under this section of the guidelines, because, were
25   it otherwise, enhancement would be warranted every
```

32

```
 1    time an armed robber entered a bank, for a threat

 2    not to move is implicit in the very nature of armed

 3    robbery."

 4           And I believe, if the Court will recall,

 5    these were very quick robberies.  These were

 6    robberies being effectuated in minutes, not even

 7    quarters of an hour.

 8           And with that kind of time period, with

 9    the way this operation was being conducted, I think

10    factually we can conclude that this was very much

11    like Garcia that, yes, people had guns pointed at

12    them and they had to take action as a consequence of

13    having a gun pointed at them.  But that doesn't

14    quite meet the threshold, because implicit in every

15    armed robbery is that same notion.

16           So I would say that that is a significant

17    enough of a change in the law that the Court isn't

18    bound by the law of the case in this instance

19    despite the fact that the facts haven't changed.

20           THE COURT:  Thank you very much.

21           I do think it's the law of the case.  But

22    even if it weren't, the original presentence report

23    noted that on April 24th of 2008, the defendants and

24    codefendants entered Bank of America and robbed the

25    bank in a takeover fashion.
```

```
 1              This is very different than walking in
 2      with a gun and saying, "Put all your money in a bag,
 3      and I will get out of here."
 4              The defendant -- all four defendants wore
 5      masks and gloves and were armed with handguns.  One
 6      was armed with a rifle.  The other carried a taser.
 7      All the employees feared for their lives and were
 8      put on the floor at gunpoint.  One codefendant,
 9      referred to as a participant, used a stun gun three
10      times to shock a bank employee who he thought was
11      lying about being the manager.
12              One defendant jumped the counter, teller
13      counter, and hit the manager over the head with an
14      unknown object after he suspected the manager was
15      going to activate the alarm.
16              When a defendant asked for the manager,
17      the manager acknowledged himself, and a gun was
18      pointed at his head.  The manager advised
19      participants that she needed a second person in
20      order to open the vault.  The manager was tasered on
21      her arm and told to hurry up.
22              Blah-blah-blah.
23              So I think that's more than enough facts
24      to support restraint under the new or old law, but I
25      think it's the law of the case in any event, and I
```

1   overrule the objection.

2              So what's the next objection?

3              MR. HUNTER:  Your Honor, our next

4   objection is to the application of the five-point

5   enhancement in the calculation of the base offense

6   level for Group 1.

7              THE COURT:  Yeah.

8              MR. HUNTER:  Group 1 presently consists of

9   a felon in possession of a firearm count and a

10  conspiracy to commit bank robbery count.

11             The -- in the original presentence report,

12  the enhancement at issue here could not have been

13  applied because there was a 924(c) conviction as

14  well in that grouping.  And the guidelines expressly

15  prohibit the use of that five-point upward

16  adjustment when there is within the group a 924(c)

17  count, as well.

18             But as a consequence of the 5th Circuit's

19  relief --

20             THE COURT:  Yeah.

21             MR. HUNTER:  -- that 924 --

22             THE COURT:  The last appeal, the second

23  appeal --

24             MR. HUNTER:  The -- the 5th Circuit --

25             THE COURT:  Third appeal.

```
 1            MR. HUNTER:  Right.  Exactly -- has
 2   eliminated that 924(c), and so now the presentence
 3   report reflects this five-point increase.
 4            But I would submit to you, Your Honor --
 5   and certainly if we're going talk about is there a
 6   decision on point, no.  I looked and looked and
 7   looked.
 8            But I think if we look at how the
 9   application notes of the guidelines try to walk us
10   through this principle, there's a lot of concern
11   about double counting in situations where firearm
12   enhancements are available in a non-firearm-based
13   offense like conspiracy to commit bank robbery.
14            And that makes a lot of sense, because
15   there are oftentimes going to be companion offenses
16   charged in conjunction with a bank robbery.  And
17   there will be necessarily, then, a lot of temptation
18   to, you know, count coup on that gun for multiple
19   enhancements across the board, and I think that's
20   what's happening here.  And I think it is not
21   dissimilar from the other rationale that are set
22   forth in the guidelines.
23            I would like to walk through a couple of
24   provisions.
25            THE COURT:  Absolutely.
```

36

```
 1            MR. HUNTER:  2B3.1, in the commentary
 2   section of the guidelines, there is a provision on
 3   double counting.  And in particular, it talks about
 4   how the enhancement for brandishment or possession
 5   of a dangerous weapon is not double counting in a
 6   bank robbery prosecution --
 7            THE COURT:  Slow down a little bit.
 8   You're talking fast again.
 9            MR. HUNTER:  It's not double counted in a
10   bank robbery prosecution, because the possession of
11   a weapon is not an element of that offense.
12            So if -- if it was just a conspiracy to
13   commit bank robbery, there wouldn't be a -- a
14   concern here, because the bank robbery, itself,
15   doesn't have a gun as a component.
16            But because this group has tethered into
17   it, felon in possession of a firearm, we are being
18   hit on Mr. Duffey from both directions.  He's
19   getting a five-point enhancement for the calculation
20   of his offense total because there was a
21   brandishment of a firearm.  But the brandishment of
22   the firearm was already taken under consideration by
23   the Commission when they recommended a guideline
24   range for the felon in possession of a firearm which
25   has been grouped into our count.
```

1          So I think that we can recognize plainly

2    that an element of felon in possession of a firearm

3    is a gun.  So it would strike me that having it be

4    taken that way doesn't quite work.

5          And the Government, in their response to

6    our objections, seems to imply that this is a

7    meritless argument, because the gun is only being

8    considered as an enhanceability ability factor in

9    the conspiracy to commit bank robbery.

10         But I think that that's just simply

11   another way of saying that perhaps it isn't a

12   problem ever if there isn't any direct additional

13   consequence for applying the enhancement on the less

14   severe charge within the group.  And I don't think

15   that that necessarily follows.

16         I mean, consequences are not what we're

17   looking at entirely.  It's about, are we

18   intellectually entitled to use this same element,

19   this same legal factor, I mean, historical fact

20   multiple times in our calculation irrespective of

21   what the math comes out to at the end.  I don't

22   think that that follows.  We are being prejudiced by

23   its consideration.

24         THE COURT:  Okay.  But you have no cases

25   on point.  Right?

```
 1            MR. HUNTER:  No, Your Honor.  I'm still

 2   walking you through my application note analysis.

 3   But I don't -- I can't find a case that has

 4   addressed these two things together.

 5            I will submit that the Government was

 6   unable to cite a case, either, in its contention

 7   that this is a meritless argument.  I like to think

 8   that just means that this is a new one --

 9            THE COURT:  We will adopt it as a new one.

10            MR. HUNTER:  -- and we should pay special

11   attention.

12            The -- the rationale that's given for why

13   924(c)'s can't get this enhancement -- rather, why a

14   bank robbery can't get this enhancement if there's a

15   companion 924(c) in the group, I think is also

16   instructive for why we are correct.

17            Pursuant to the application notes to the

18   guideline applicable to firearm convictions, a

19   firearm enhancement cannot be added if the defendant

20   has been separately convicted and sentenced under

21   18 U.S.C 924(c) for using a firearm --

22            THE COURT:  Slow down.

23            MR. HUNTER:  -- for using a firearm in the

24   same robbery.

25            What this strikes me as is, the Supreme
```

```
 1    Court has always, you know, emphasized Blockburger
 2    over transactional jeopardy, that the Commission
 3    recognizes the implicit need for that fairness to
 4    prevent transactional jeopardy.  It doesn't want
 5    courts to be using these things over and over again.
 6              I recognize that double counting illegally
 7    occurs in the guidelines all over the map, and that
 8    fundamentally most of the arguments that are made
 9    about this are made purely on whether the Commission
10    has said explicitly that they can or that they
11    can't.
12              But I do think there is a due process
13    concern that needs to be factored in here.  And I do
14    think, based upon what the Commission has laid out
15    for us in all of these very similar examples, that
16    it would logically flow.
17              I think that if the Commission had been
18    asked this question outright and explicitly, it
19    would have been considered this way, the way that
20    I'm submitting to you; and that there's a due
21    process reason why, even absent express guidance
22    from the Commission about the factor that the Fifth
23    Amendment would still prohibit the double counting
24    here.
25              Lastly, Your Honor, I think that there is
```

1    always a secondary concern, a due process concern,

2    when a defendant is up on resentencing and some kind

3    of a hoist on his own batard-type instance like this

4    occurs; in other words, that under the previous

5    iterations of the presentence report that have been

6    entertained by Your Honor, this was something not up

7    for discussion because the 924(c) blocked it.

8            THE COURT:  Right.

9            MR. HUNTER:  But the fact that the 924(c)

10   conviction is unconstitutional, Mr. Duffey now gets

11   a higher adjustment on this group.  And I think that

12   that, in and of itself, is a concern as well,

13   especially when it's so semantic.

14           We are talking about the difference

15   between felon in possession of a firearm in an

16   indictment that is surrounding by bank robberies for

17   an offense date that is the identical date of one of

18   those bank robberies.  And the conclusion could be

19   that we're going to apply the five-point adjustment.

20           But on the other side of the coin, if it's

21   a 924(c) and it's use of exhibition of a firearm in

22   furtherance of a crime of violence, which is exactly

23   the same conduct, definitionally, then we can't

24   entertain it.

25           THE COURT:  You make a very reasoned

```
1    argument.
2            MR. HUNTER:  Thank you, Your Honor.
3    That's that objection.
4            I have one more, but I will --
5            THE COURT:  No -- yes.  Thank you.
6            Ms. -- yes, Ms. Mitchell.
7            MS. MITCHELL:  I also had no luck finding
8    a case on point.
9            The -- that five-level enhancement is the
10   only thing that accounts for there being a gun in
11   that offense grouping at all.
12           And then, add to that the fact that
13   there's nothing within the guidelines that prohibits
14   double counting.  Even if it were double counting,
15   it's not impermissible double counting in this
16   instance.
17           So it's the Government's position that
18   that five-level enhancement should be there.
19           THE COURT:  I agree with her.  I think you
20   make, as I said, a very reasoned argument about
21   this.  Leave that up to the Commission to decide.
22   But I do think that, based on what the addendum has
23   on page 3 through 4 of that, dealing with the
24   two-level enhancement, and also with the
25   Government -- I'm sorry.  We're talking about a
```

1    five-level enhancement.  Yeah.

2              Hold on.

3              It is page 2 and 3, that the reasoning

4    there -- and I'm not going to read it.  I adopt it,

5    though.  And the reasoning that the Government has

6    in their response, as well as what she just said, I

7    completely agree with right now.

8              Double counting is something we need to

9    talk about, the Commission needs to talk about, but

10   not here.  I don't think it applies necessarily

11   here, doesn't apply here, so I'm going overrule the

12   objection.

13             Okay.  Next objection.

14             MR. HUNTER:  Yes, Your Honor.  And this

15   is, I guess, less than an objection than it is a

16   contention.

17             THE COURT:  I'm not going to consider his

18   disciplinary record.

19             MR. HUNTER:  Okay.  Well, that takes a

20   great deal of concern out of it.

21             But this is something that -- I apologize

22   to the Court -- I did not brief, but I would like to

23   argue for the record --

24             THE COURT:  Okay.

25             MR. HUNTER:  -- on the alternative in

43

1    light of the fact the Court has denied our request

2    that the First Step Act be applied.

3                THE COURT:  Um-hum.

4                MR. HUNTER:  And that is that, because

5    Count 2 was invalidated by Davis, and because

6    Count 2 is the triggering count, in other words all

7    the other 924(c)'s get that 25-year mandatory

8    minimum because they are referring back to Count 2.

9                THE COURT:  Um-hum.

10               MR. HUNTER:  Then what we have here is, is

11   we have essentially a building with no foundation.

12   We -- we've lost the -- the tie-ins count of the

13   indictment that justified application of that

14   mandatory minimum in all of the other remaining and

15   surviving 924(c) counts.

16               And I would submit that the Court has the

17   power at sentencing to throw out counts of

18   conviction where the evidence is no longer supported

19   or where there is, in fact, a constructive amendment

20   taking place in order for them to be properly put

21   before the Court at sentencing.

22               So if the Court is not going to apply the

23   First Step Act to these offenses, we would submit

24   that the Court should nevertheless set aside the

25   remaining 924(c) convictions in the indictment,

44

 1   because those expressly reference back to Count 2,

 2   which was invalidated.

 3             THE COURT:  Okay.  Thank you very much.  I

 4   overrule the objection.  I'm glad you noted it for

 5   the record.

 6             I will tell you, Mr. Duffey, you've had an

 7   excellent defense.  All three of these guys are

 8   really on top of their game.  And I really

 9   appreciate that your objections have been so

10   thorough, but I overrule them.

11             MR. HUNTER:  Thank you, Your Honor.

12             THE COURT:  I know the objection to --

13   what was it?  Hold on a second.  Certain section was

14   agreed to -- oh, yeah.

15             The probation officer, in the third

16   addendum -- fourth addendum on page 2 supported the

17   objection to paragraphs 139 and 140.  As to those

18   paragraphs, a third addendum is corrected in the --

19   in the correction section of the third addendum.

20             Is that -- is that satisfactory to you?

21             MR. JAMPALA:  It is, Your Honor.

22             THE COURT:  Okay.  Okay.  All right.

23             So are there any other objections?

24             MR. HUNTER:  That covers all of our

25   objections, Your Honor.

45

```
 1              THE COURT:  Okay.  Then I'm going to adopt
 2   the presentence report, its fourth and third and
 3   second addendums, as the findings and conclusions of
 4   the Court.  And I'm not going to stay up here and
 5   say what the guideline range is.  I'll talk about
 6   that, because it's too difficult to -- we can talk
 7   about that when I get to it.  But now it's time for
 8   you to put on your case.
 9              MR. JAMPALA:  Yes, Your Honor.
10              We have two witnesses we would like to
11   call before allocution.
12              THE COURT:  Okay.
13              MR. HUNTER:  We'll first call Anthony
14   Lockhart.
15              THE COURT:  Okay.  Mr. Lockhart, come on
16   up here.
17              MR. HUNTER:  I think he's in the hallway,
18   Your Honor.
19              I'll be right back.
20              (Pause in the proceedings.)
21              THE COURT:  Mr. Lockhart, come on up here,
22   over to the lecturn.
23              Thank you.
24              What's your name?
25              MR. LOCKHART:  Anthony Lockhart.
```

```
 1              THE COURT:  Go ahead.
 2                  QUESTIONING BY MR. HUNTER:
 3   Q.   Could you please state your name for the
 4   record?
 5   A.   Anthony Cortez Lockhart.
 6   Q.   Mr. Lockhart, how are you employed?
 7   A.   Well, I have my own business.  I own Amazing
 8   Kicks and Fits, in Austin, Texas.
 9   Q.   How long have you been doing that?
10   A.   I've been doing that for like two years.
11   Q.   Before that, what were you doing?
12   A.   I was working at BMC Material Construction.
13   Q.   Okay.  And before that?
14   A.   I was in prison.
15   Q.   All right.  How long were you in prison for?
16   A.   Like nine and a half years.
17   Q.   Nine and a half years.
18        Federal system?
19   A.   Yes, sir.
20   Q.   In that time in the Federal penitentiary, did
21   you have a time to meet Corey Duffey?
22   A.   Yes.  I met him at the end of my sentence, the
23   last 14 months.
24   Q.   Last 14.
25   A.   Yeah.
```

1   Q.   If you don't mind me asking, what were you in

2   for when you went to prison?

3   A.   Possession of cocaine with intent to distribute

4   and possession of a firearm by a felon.

5   Q.   Was that your first time to get in trouble?

6   A.   No, sir.

7   Q.   You've been in trouble a lot before that?

8           THE COURT:  But no more.  Right?

9           THE WITNESS:  No, no, no, ever.  It's over

10  with.

11  Q.   (By Mr. Hunter)  What do you attribute that

12  change to in your life?

13  A.   When I got in the Federal system, I met a guy

14  named Corey Duffey on the last part of my sentence.

15  And, you know, before that I stayed in a lot of

16  trouble, you know, as the old guy.  You know what

17  I'm saying?  And he's younger than I am.

18       So we had a lot of talks.  We always used to

19  talk about the streets and talk about how to better

20  ourselves as parents, brothers and fathers.  And due

21  to the situation of putting ourselves and subjecting

22  ourselves in the same situation, it's called

23  insanity if you keep doing it over and over.

24           THE COURT:  It is.

25           THE WITNESS:  So that being said, I took

```
 1    it into consideration.  And when I was released, I
 2    didn't even go back to the same neighborhood I lived
 3    in to get myself away from the environment.  And I
 4    haven't had to go back to that, and I'm not going
 5    back to that.
 6              THE COURT:  You're not going back.  I can
 7    tell.
 8              THE WITNESS:  Yeah, I'm not going back to
 9    that.  I've been out for like -- January 10th was
10    five years for me.
11              THE COURT:  Congratulations.
12              THE WITNESS:  Yes.
13    Q.   (By Mr. Hunter)  Let me ask you this:  You
14    understand Mr. Duffey is here for resentencing.
15    A.   Yes, sir.
16    Q.   If there's something you would like Judge Boyle
17    to know about Corey more than anything else, what
18    would it be?
19    A.   He's a great person.  And he's the type of
20    person that you can listen to from a story, because
21    it's sincere.  Everything that he does -- you can go
22    to him about any situation and ask him about it.
23    And it's a lot of things he's done from the inside
24    to help people to get outside.  There's no guarantee
25    you're coming home, and I'm a firm believer of that.
```

```
 1   I've seen a lot.
 2        And he -- he is the person who made a lot of
 3   things clear in my vision to keep my family from
 4   being incarcerated.  It's not just me, because when
 5   I went to prison, my family went with me.  I didn't
 6   like that.
 7             THE COURT:  Thank you very much.  That was
 8   very eloquent.  I appreciate it.
 9             MR. JAMPALA:  Thank you, Mr. Lockhart.
10             We will pass the witness.
11             THE COURT:  No, no.  Call your next
12   witness.  It's just a character witness.
13             MR. HUNTER:  Our next witness, I believe,
14   is Gregory Rambo.
15             THE COURT:  Okay.  Come on up here, sir.
16             How are you?  Go ahead.  What's your name?
17             THE WITNESS:  Greg Rambo.
18             THE COURT:  Okay.  Mr. Jampala, do you
19   want to ask questions or just have him tell me.
20             MR. JAMPALA:  Just a couple of questions
21   Your Honor.
22             THE COURT:  Sure.
23             QUESTIONING BY MR. JAMPALA:
24   Q.   Can you state your name for the record?
25   A.   Yeah.  It's Gregory J. Rambo.
```

50

```
 1   Q.   And most of your adult life you spent in and
 2   out of prison?
 3   A.   Yes, a great deal; yes.
 4   Q.   Can you tell us briefly how many stints you
 5   did?
 6   A.   Oh, well, I did about four stints, different
 7   stints that I went in and out of prison.  I've
 8   probably got 33 years of 60 years of my life on
 9   earth in prison.
10             THE COURT:  Hmm.
11   Q.   (By Mr. Jampala)  And could you tell me a
12   little bit about this last stint and how you met
13   Corey Duffey?
14   A.   Well, last stint was -- well, you know, it was
15   uneventful from the start, because I had so much
16   time --
17             THE COURT:  You have to speak up.
18             THE WITNESS:  It was pretty uneventful
19   from the start, because I had so much time.  I
20   really didn't know what it is I was going to do
21   after I got done doing the time I was doing.
22             But, you know, at Florence USP is when --
23   I believe it was 2016 is when Corey had came to that
24   facility and on the unit that we were on.  So we --
25   you know, we got to know each other, and we were
```

51

1    cellies.  So during that time as cellies, I didn't

2    know what I was going to do.

3             Because he asked me, Ram, what you gonna

4    do when you get out, old man?

5             And I said, man, I don't know.

6             I generally got out and went back to what

7    it is I was doing initially.

8             So he started talking to me about trucks

9    and driving trucks.  And he went on about how he

10   drove trucks.  And it was kind of interesting,

11   because it kind of fits the person I am, being able

12   to be out and about and, you know, roaming the

13   earth.

14            THE COURT:  Yeah.

15            THE WITNESS:  So he said, man, you know,

16   this would be good avenue for you.  This right here

17   could take care of a whole lot of things that you

18   want to take care of.  Man, you know, give it some

19   thought.

20            So I started asking more questions.  He

21   started -- he was just readily giving me all the

22   information I needed.  So when I got out, that's

23   what my mind was on.  So when I went to see my

24   federal parole officer, he asked me, what do you

25   want to do?

```
1              I said, I want to drive trucks.  I want to

2      get my CDL.

3      Q.   (By Mr. Jampala)  And you now have your CDL.

4      A.   Yes.  Right now I'm driving for Next Level.

5      And I had them give me a load here so I can be here

6      today.  So yeah, I'm driving for Next Level now.

7              THE COURT:  That's wonderful.

8      Q.   (By Mr. Jampala)  And just before this, you

9      never met people in the prison that wanted to help

10     you the way Corey did.

11     A.   You have a lot of people in prison that talk,

12     but that's not -- they wasn't genuine with it.  Him,

13     even though he's much younger than I am, he has a

14     whole lot of wisdom.  He has a great deal of

15     understanding.  And he speaks -- basically it's like

16     an old soul in a young body.

17         And he's very disciplined in what he does.

18     What he says he's going to do, he does it; sticks to

19     the script, doesn't go off course with it.  So

20     therefore, that's why I took him as for what he

21     stated would be true and what he -- what he brought

22     me into is -- is all the fruits of the labor of it

23     is great, so. . .

24             THE COURT:  That's so nice.

25             THE WITNESS:  He pretty much saved me from
```

```
 1   being -- being before you seeing 30, 40, 50 years or
 2   whatever.
 3               THE COURT:  I really appreciate that very
 4   much.  I mean, I appreciate -- you know, you guys
 5   coming down here means so much, because you are
 6   former prisoners with him.  And you're telling me a
 7   story that I have to believe, and I do believe, and
 8   it's great, and I thank you.
 9               MR. JAMPALA:  Thank you, Your Honor.
10               THE COURT:  Okay.  You can go ahead and
11   step outside or stay in the courtroom.
12               Okay.  Mr. Duffey, I would like to hear
13   from you.
14               THE DEFENDANT:  Yes, ma'am.
15               MR. HUNTER:  Your Honor, I'm sorry.
16   Before you do that, it dawned on me there was one
17   additional objection I needed to make, and I have
18   not made it.
19               THE COURT:  All right.  You can make it.
20               MR. HUNTER:  I understand.
21               Your Honor, with respect to the
22   presentence report, the restitution order in this
23   case held Mr. Duffey jointly and severally liable
24   for a substantial sum of money.  We would ask the
25   Court if it could to -- in light of Paraline
```

 1   (phonetic), to reconsider its restitution order in

 2   this case and to hold Mr. Duffey only accountable

 3   for the portion directly attributable to him.

 4            THE COURT:  Okay.  Overruled.

 5            Okay.  Go ahead, Mr. Duffey, come up with

 6   one of your lawyers.

 7            THE DEFENDANT:  Okay, Your Honor.  I would

 8   definitely love to allocate, and I would like to

 9   begin with a sincere apology to all of the victims

10   affected by my foolish acts.

11            THE COURT:  Yeah.

12            THE DEFENDANT:  The bank employees, the

13   bank customers and the possible residual trickledown

14   in effects that might have impacted their families.

15            Regarding my growth, as well as the

16   transformation of my perspective, so far I've been

17   at this courthouse (inaudible) is the Government's

18   characterization.  And it's obvious from the second

19   and the third addendum to the presentence report,

20   that the Government is going to continue to portray

21   me as a monster before this Court.

22            The Government's addendum to the

23   presentence report, the Government has cited

24   numerous disciplinary infractions.

25            THE COURT:  I'm not going to consider

1    those.  Don't even talk about them.

2          THE DEFENDANT:  Okay.  Okay.  I'll move

3    on.

4          THE COURT:  Okay.

5          THE DEFENDANT:  However, the Government

6    barely mentioned the well over 20 various adult

7    continuing education courses that I completed.

8          THE COURT:  Yeah.  I saw those.

9          THE DEFENDANT:  Critical thinking courses,

10   psychological programs, parenting courses, financial

11   education courses, so forth and so on, Your Honor.

12         The Government also declined to make this

13   Court aware of the fact that I have not come close

14   to receiving a disciplinary report in over five

15   years.

16         It took me a little over eight years to

17   begin to truly understand and realize the fact that

18   the world don't owe us nothing, you know.  Life,

19   itself, is a blessing.  And we have an obligation

20   not to take life for granted.  We have an obligation

21   to contribute to society and humanity in a positive,

22   productive and beneficial way.

23         I hate the fact that the foolishness,

24   whatever you may call it, I've spent the majority of

25   my life taking life for granted.  It's a direct

56

 1   insult to God, our direct ancestors and forefathers

 2   and humanity.

 3            For eight years after my incarceration, I

 4   was angry, bitter, miserable, frustrated --

 5            THE COURT:  Yeah, I think I know that.

 6   Yeah, I think I remember that.

 7            THE DEFENDANT:  -- and many other things.

 8   At that time, I didn't hold myself responsible for

 9   the choices that I made that has resulted in this

10   current incarceration that I'm facing.

11            Your Honor, this incarceration has led to

12   my realization and understanding of many things, and

13   has led to a lot of reflecting and soul searching on

14   my part.  There's not a week that goes by that I

15   don't reflect upon and regret the impact that the

16   choices that I made and the crimes that I committed

17   have.

18            I would like to go over the psychological

19   implications, as well as the financial implications.

20            From a psychological standpoint, I sit

21   back and I think about, you know, you take an

22   average bank employee to get up a minimum of five

23   days a week to go to work, bust their butt to

24   provide a better quality of life for themself and

25   their loved ones.  And here I come storming in

```
 1    dressed in dark clothing with a firearm in hand.
 2              THE COURT:  And a taser and body armor.
 3              THE DEFENDANT:  Yes, Your Honor, yes.  I
 4    did not have the right to do that.  It was a blatant
 5    disregard and disrespect for the well-being and the
 6    rights of others.  And, again, I would like to
 7    apologize to the victim's impact of all those acts
 8    that I committed.
 9              The financial implications, I'm sure just
10    due to your profession that you know -- and you
11    understand this more than I do -- at that time this
12    nation was going through an economic regression due
13    to predatory lending practices and a laundry list of
14    other things.
15              THE COURT:  Yeah.
16              THE DEFENDANT:  I sit back, and I think
17    about maybe a small business with only two or three
18    employees just trying get by at that time --
19              THE COURT:  It was awful.
20              THE DEFENDANT:  And yeah.  And the
21    businesses that went under due to the money I took
22    during those robberies.
23              Your Honor, I would like to give this
24    Court some insight into my experiences in life just
25    in general, as well as my experiences in prison that
```

58

 1  has led to my redemption, my growth, a little bit of

 2  maturing and --

 3           THE COURT:  As long as you can keep it

 4  somewhat short.  Okay.

 5           THE DEFENDANT:  Okay.

 6           THE COURT:  I mean, I can't have you go on

 7  and on, because we have other cases.  But go ahead.

 8  Go ahead.

 9           THE DEFENDANT:  Okay.  I'll -- I'll skip a

10  lot of it, and I will start with school at the age

11  of 14.

12           My mother, you know, she had a job making

13  a little bit -- her and my father separated, been

14  separated.  She had a job making a little bit over

15  minimum wage, you know.  She worked, picked up extra

16  shifts to kind of provide for my needs, not only my

17  needs, but my wants.  And I love her for that.

18           We stayed in a poverty stricken,

19  crime-infested, drug-infested neighborhood.  She was

20  working extra shifts and couldn't watch me.

21           I remember coming home one night I was

22  out.  And I was jumped by four adults.  And to this

23  day, I don't know the reason.  I was -- I just

24  assume I was in the wrong place at the wrong time.

25           THE COURT:  Yeah, yeah.

```
 1            THE DEFENDANT:  If you work with me here,
 2    it's going to come together.
 3            THE COURT:  Yeah.
 4            THE DEFENDANT:  Three months after that, I
 5    was shot at, and I know what that was about.  At the
 6    time I didn't.  I was ignorant to that fact, but now
 7    I know what it was about.  I had a blue (inaudible)
 8    jacket, and I was walking through Blood territory.
 9            THE COURT: Yeah, yeah.
10            THE DEFENDANT:  That all changed my
11    perspective of life.  And my attitude at that point
12    became, I will never be a victim again.  And the
13    ironic thing about that is that I let those events
14    turn me -- I became, later on, worse than the
15    individuals who victimized me.
16            Now, one of my values is that the
17    confidence from incarceration that I've actually
18    attained is that the way that we deal with adversity
19    defines our true character.
20            I began running in the streets and
21    associating with the wrong crowds.  And as a result
22    of that, just three short years later, shortly after
23    my 17th birthday, I was incarcerated at the Texas
24    Department of Criminal Justice.
25            I was released from prison.  I met the
```

60

1    mother of my child, Andrea.  We had our first son,

2    Corey.  We called him Baby Corey at that time.

3           I took to fatherhood with a passion.  And

4    I didn't understand it at that time, but now I

5    definitely understand through reflection.  So I took

6    fatherhood with a passion due to the fact that I

7    didn't have a father in my childhood.  I changed

8    diapers, spent as much time as I possibly could with

9    my kids.

10          This led me and Andrea to really sit down

11   and come up with a plan.  The plan was I would go to

12   truck driver training school, obtain my CDL, get a

13   career in truck driving to financially support the

14   household.

15          Meanwhile, Andrea would take care of the

16   child in the household, and she would go to college

17   to attain a degree in accounting.  And once she got

18   that degree in accounting and found employment, I

19   would then make a decision if I wanted to go into

20   the business side of the trucking industry or go to

21   a trade school to do something different.

22          Andrea, she come from a close-knit family.

23   She had a sister and a brother.  Her father was

24   offered a promotion.  They relocated to a suburb of

25   mine.

61

```
 1              THE COURT:  Can you cut forward a little
 2    bit?  You're telling me a lot of stuff, and I don't
 3    need to know all that stuff.
 4              THE DEFENDANT:  Yeah, it kind of goes into
 5    just my growth.  But I tell you what, I will skip
 6    that.  We separated.  I just -- I -- I -- we
 7    separated.
 8              THE COURT:  You did.  You did.
 9              THE DEFENDANT:  Okay.  I took her to the
10    airport.  They left.  I went back to the house.  To
11    say I was crushed and heartbroken wouldn't begin to
12    describe my feelings at that time.  I couldn't even
13    stay in my house.  I moved forward.
14              Obviously I had a change of plans, and
15    those change of plans started to be a pattern, and
16    this is what I was working towards.
17              THE COURT:  Bank robberies.
18              THE DEFENDANT:  It goes back to I had a
19    choice in adversity.  I made a choice and entered
20    back into the criminal lifestyle.  And as a result
21    of that, I stand before this Honorable Court today.
22              I spent the first eight years in prison.
23    As you can see from my disciplinary record --
24              THE COURT:  Yep.  Not counting it, but go
25    ahead.
```

```
 1              THE DEFENDANT:  I didn't get it.  I
 2   started to go left.  But something clicked.  And
 3   I -- I personally know that it was the time that I
 4   actually spent sitting inside isolation, in a
 5   lockdown cell, if you will, as a result of my
 6   actions.  Gave me time to kind of study, to read,
 7   and start to begin to understand things, transform.
 8   It was the process that planted the seed, if you
 9   will, to transform my mortality and my perspective
10   on life, and that's what led me actually to go
11   right.
12              I had a lot of time to really do a lot of
13   soul searching and reflect.  And in some ways this
14   incarceration has been a blessing in disguise
15   because of the transmission of my perspective.
16              And majority of people, as you know, with
17   recidivism rate in this nation, that's not going to
18   happen.
19              THE COURT:  If you could sort of wrap it
20   up.
21              THE DEFENDANT:  Okay.
22              THE COURT:  I'm sorry.  It's just kind of
23   long.  I appreciate it very much, but . . .
24         (Discussion between attorney and client.)
25              THE COURT:  I will just say, I can tell
```

1    you are different than you were.  I can tell.

2              THE DEFENDANT:  Yes, yes, yes.  I have an

3    actual program.  You got a letter from a

4    Mr. Flowers, a letter of support.

5              This is an individual that I was locked up

6    with.  We talked about the program.  I'm pretty sure

7    that you know he got a program out there.  He's from

8    DC, works with City Council and the Mayor.  I got a

9    program called Path Program.  Within the first two

10   years of release that I -- I will actually start it.

11   I will skip ahead.

12             THE COURT:  Go ahead.

13             Anything else?

14             Just go ahead.

15             THE DEFENDANT:  If -- if you would allow

16   it, I would like to kind of speak in regards to the

17   924(c).

18             THE COURT:  I've heard that from your

19   lawyers.  I really don't need to talk about that

20   again.  I'd just like you to wrap it up, because I

21   think they have covered the 924(c)'s adequately,

22   more than adequately, thoroughly, and I don't need

23   anything else on that.

24             THE DEFENDANT:  I mean, if --

25             THE COURT:  You can say a couple of

```
 1    sentences, but I would like for you to wrap it up.

 2              THE DEFENDANT:  Okay.  Okay.

 3              THE COURT:  You can say a few sentences on

 4    it.

 5              THE DEFENDANT:  Thank you, Your Honor.

 6              As you know, Count 2 is the original

 7    924(c) in this case.  And you know it better than I

 8    do, but 924(c)(1)(A) and --

 9              THE COURT:  I've heard this from them.  I

10    mean, I understand what you are going to say.  Just

11    wrap it up, please.

12              THE DEFENDANT:  Okay.  Okay.  Yeah, at

13    this point, Your Honor, I thank the Court.  I thank

14    you for the time that you put out.  First, I

15    apologize for wasting your time.

16              THE COURT:  You're not wasting my time.

17              THE DEFENDANT:  I thank you for the time

18    you put into reading this case and reading over my

19    letters of support.

20              THE COURT:  You have so many letters.  It

21    took me a good hour to go over those letters.

22              THE DEFENDANT:  Okay.  I thank you.  I

23    thank my attorneys for the excellent job they did.

24              THE COURT:  Well, you have excellent

25    attorneys.  I don't know where they came from or how
```

65

```
 1    they got on the case, but I'm very impressed.
 2              THE DEFENDANT:  If I could ask one more
 3    thing.  I'm sure you're familiar with the case
 4    law -- Supreme Court case that came out a few years
 5    ago with regards to 924(c), that you can consider
 6    predicate offenses.  And if you so choose to, with
 7    your discretion, that you could sentence me to what
 8    you chose to sentence me to for those predicate
 9    offenses.
10              THE COURT:  Thank you very much.
11              Anything else?
12              THE DEFENDANT:  That's it, Your Honor.
13    Thank you for your time.
14              THE COURT:  Thank you very much.
15              Which lawyer is going to speak?  Just
16    briefly.  Just briefly.
17              MR. HUNTER:  We thank you, Your Honor, for
18    everything, for your due consideration here.  It's,
19    I think, patently clear to me, to everyone that,
20    Mr. Duffey is a very different man --
21              THE COURT:  Yeah, a very different man.
22              MR. HUNTER:  -- than the person who was
23    before you in 2008.
24              I'll share just a brief personal anecdote.
25    This summer, my father was very ill, and I had to go
```

66

1   up to Amarillo to the hospital.  And Corey called

2   me, and we were on the speakerphone with my mother

3   in the car.  And I explained I couldn't talk at the

4   moment and why.  And he expressed his condolences

5   and, you know, wished my father a speedy recovery.

6           And we got off the phone, my mother said,

7   Who was that?

8           I said, A client of mine.

9           She goes, What was he charged with?

10          And I said, Well, he was convicted of some

11  bank robberies.

12          And she laughed and she goes, That's a

13  bank robber?

14          I think that that perhaps is one of the

15  most glowing endorsements we can have of Mr. Duffey.

16          THE COURT:  It is.

17          MR. HUNTER:  Certainly we understand the

18  Court's rulings are going to necessitate a very

19  harsh sentence in the case.  There's no way around

20  it in light the overruling of our objections.

21          We believe that the Court should vary from

22  the guidelines based upon this.  This is an

23  exceptional human being.  This is someone who has

24  done something that very few people can accomplish

25  in the system.  And we would ask that the Court vary

1   from the guidelines to the lowest possible sentence

2   that can be assessed in this case.

3           And then, of course, just simply for --

4   well, I guess at the end I will have to do what I

5   have to do for preservation sake.

6           So I will leave it at that.  Thank you

7   very much.

8           THE COURT:  Thank you very much.

9           Ms. Mitchell or Mr. Tromblay?  And keep it

10  short, please.

11          MS. MITCHELL:  Your Honor, as much as

12  Mr. Duffey may have changed in the last eight years,

13  it doesn't change his underlying conduct and the

14  dangerousness of that conduct and that it was, you

15  know, essentially torture for those bank employees

16  to have to go through.

17          It's the Government's belief that a

18  sentence within the guideline range on those

19  underlying offenses would be appropriate under the

20  3553 factors.  And we would ask the Court to impose

21  a guideline sentence on the underlying and then the

22  five years plus the 25 by four.

23          Thank you.

24          THE COURT:  Thank you very much.

25          Mr. Duffey, do you want to come up with

1  one of your lawyers?  Both of your lawyers?  Yeah.

2          Mr. Duffey, I can see that your demeanor,

3  even if I'm not looking at your words, your demeanor

4  is much better.  You've grown substantially in

5  prison.  And all these letters that I got, my gosh,

6  I just -- you know, I can't overlook them.

7          And so I know you are a better person.  I

8  know you affected two prisoners' lives, if not more.

9  I know that you had tons of support.

10          Do you have any family out here today?

11          THE DEFENDANT:  Yes, Your Honor, I do.

12          THE COURT:  Who is it?

13          Just stand.

14          Thank you-all very much for coming.  Wow.

15  Thank you-all very, very much for coming.  I really

16  appreciate it.  You can be seated.

17          Okay.  But, I mean, it doesn't get past

18  the facts of the case.  I mean, these were several

19  violent bank robberies, takeover bank robberies with

20  body armor, tasers, guns, all sorts of guns, leaping

21  over the counters, hitting and tasing bank tellers

22  who will never be the same because of it.

23          I mean, I think all the facts that I have

24  already cited to in my previous sentencings and

25  those facts, all combined to -- you know, the 3553

1    factors, number one, here is deterrence.  And I

2    just -- I can't have them.  I just can't allow

3    someone who committed that many bank robberies to

4    get out early.  I will -- I will -- I will

5    seriously -- it's going to be a shorter sentence,

6    but it's not going to be what you want.

7             There's the -- there's the nature and

8    characteristics of the defendant.  I know you're

9    great now, but you weren't then.  And -- and just

10   the safety of the community.

11            So all of those reasons, I think, and all

12   of the 3553 factors combined to call for the

13   following sentence:

14            On Counts 1, 14, 15, 16, 20, 24, 28, 32

15   and 36, 60 months in custody -- a total of 60 months

16   in custody.

17            For Count 5, 120 months in custody to run

18   concurrently with the 60 months.

19            And then we're going to Counts 22, 26, 30,

20   34 and 38.  That's 300 months to run concurrently

21   with all the previous counts.

22            Then on Count 23, 60 months.  But this one

23   is going to run consecutively to the other sentences

24   imposed.

25            And Count 27, 31, 35 and 39, 300 months to

1   run consecutively, for a total of 1,200 months in

2   custody.  It's not the 3,200 months.  It's not the

3   4,800 months.  It's 1,200 months in custody.

4           And I would give this sentence regardless

5   of the five-level, two-level enhancements, any of

6   the enhancements that applied in this case, I would

7   give this sentence regardless of it.

8           In addition, on all of the counts, you

9   have five-year term of supervised release to run

10  concurrently.  That's on all the counts.

11          There's no fine.

12          The restitution is $355,976.

13          And $100 per count for a total of $2,000.

14          So pursuant to the Sentencing Reform Act

15  of 1984, it is the judgment of the Court that the

16  defendant Corey Deyon Duffey, is committed to the

17  custody of the Federal Bureau of Prisons for the

18  periods I stated.

19          Pursuant to the Mandatory Victims

20  Restitution Act of 1996, the defendant is ordered to

21  pay restitution in the amount of $355,976, payable

22  to the U.S. District Clerk, 1100 Commerce, Room

23  1452, Dallas, Texas  75242.

24          And the following entities will be

25  reimbursed, but I will leave the details to be in

1    the judgment.

2              Bank of America for 85,000.

3              State Bank of Texas for 14,000.

4              Comerica Bank for 246,000.

5              CitiBank for 5,000.

6              And Century Bank for $5,976.

7              If upon commencement of supervised release

8    any part of the restitution remains unpaid, the

9    defendant shall make payment on such unpaid balance

10   in monthly installments of not less than 10 percent

11   of the defendant's gross monthly income or at a rate

12   of not less than $50 per month, whichever is

13   greater.

14             Payment shall begin no later than 60 days

15   after release of defendant's confinement and shall

16   continue each month thereafter until the balance is

17   paid in full.

18             In addition, at least 50 percent of the

19   receipts received from gifts, tax returns,

20   inheritances, bonuses, lawsuit awards and any other

21   receipt of money shall be paid toward the unpaid

22   balance within 15 days of receipt.

23             This payment plan shall not affect the

24   ability of the U.S. to immediately collect payment

25   through the Treasury Offset Program, Inmate

1    Financial Responsibility Program or the Federal Debt

2    Collection Procedures Act, anything else available

3    under federal law.

4              Interest is waived under 18 U.S.C. Section

5    3612(f)(3).

6              Okay.  And you have 2,000 mandatory

7    special assessment.

8              Now, you can appeal this sentence.  Your

9    attorneys can appeal this for you.  You have two

10   weeks from the date of my judgment.  My judgment

11   will probably be Friday or so, and there's two weeks

12   to file a notice of appeal.

13             Gentlemen, would you make sure that if he

14   wants to appeal, the notice of appeal is timely

15   filed.

16             MR. HUNTER:  Yes, Your Honor.

17             MR. JAMPALA:  Yes, Your Honor.

18             THE COURT:  Okay.  All right.  Anything

19   else?

20             MR. HUNTER:  Your Honor, I don't know if

21   this is actually legally required anymore.

22             THE COURT:  Go ahead.

23             PROBATION OFFICER:  I'm sorry, Your Honor.

24   I just want to make sure the record is clear.

25             The 1,200 months that the Court imposed

1    for Counts 27, 31, 35 and 39, those are to be

2    consecutive to the counts, the 16 months.

3           THE COURT:  Yes, consecutively.  The last

4    edition, 27, 31, 35, 39, 300 months to run

5    consecutively.

6           PROBATION OFFICER:  To each other and to

7    the additional sentence, which would equal an

8    aggregate sentence of 1,560 months.

9           MR. JAMPALA:  Correct.

10          THE COURT:  Wait a minute.  Wait a minute.

11   Sorry.

12          Come on up here.

13          This runs -- this runs concurrently with

14   this.

15          PROBATION OFFICER:  Yes, ma'am.

16          THE COURT:  This runs consecutively -- no,

17   this runs concurrently with this.  This runs

18   concurrently with that, 300 months to run

19   consecutively, and 300 months to run consecutively.

20          PROBATION OFFICER:  Correct.  So an

21   aggregate sentence would be 1,569.

22          THE COURT:  So he added up wrong?

23          PROBATION OFFICER:  The 1,200 is only for

24   the 300 months for Counts 27, 31, 35 and 39.

25          THE COURT:  Okay.

```
 1              PROBATION OFFICER:  Those 300 months,
 2    that's 1,200.
 3              THE COURT:  Thank you for doing that.
 4              1,567?
 5              PROBATION OFFICER:  And 60.
 6              THE COURT:  60.
 7              PROBATION OFFICER:  Yes, ma'am.
 8              THE COURT:  Okay.  Anybody disagree with
 9    that addition?
10              MR. HUNTER:  Mr. Jampala is the math --
11              MR. JAMPALA:  Not with the addition, no.
12              THE COURT:  Ms. Mitchell, do you disagree
13    with that?
14              MS. MITCHELL:  That is the correct
15    addition, yes.
16              THE COURT:  Okay.  I don't know how -- it
17    says -- anyway.  1,560 months is the sentence.  I
18    apologize.  But, again, I would give this sentence
19    regardless of all the enhancement, regardless of
20    anything else that added to the sentence, I would
21    give this sentence regardless.
22              Okay.  Anything else?
23              MR. JAMPALA:  I don't think this needs to
24    be stated, but just for the sake of the record,
25    can -- the Court will, of course, be crediting
```

1   Mr. Duffey for all the time that he has served since

2   he was arrested on the case.

3             THE COURT:  The BOP has to decide that,

4   and I'm sure they will.

5             MR. HUNTER:  I probably don't need to say

6   this anymore, but old habits die hard.

7             In light of the Court's rulings, we would

8   take exception to the Court's overruling of our

9   objections, and we object to the total sentence

10  that's been imposed.

11            THE COURT:  Overruled.  Thank you very

12  much.

13            PROBATION OFFICER:  One last thing, Your

14  Honor.  I'm so sorry.  Just so the record is clear,

15  for the term of supervised release, Counts 1, 5, 14,

16  15, 16, 20, 24, 28, 32 and 36 have a cap of three

17  years.

18            THE COURT:  Okay.  Okay.  Three years to

19  run concurrently with the five-year sentence.

20            PROBATION OFFICER:  Yes, ma'am.

21            THE COURT:  Thank you very much.

22            If there's nothing else, we will be in

23  recess.  Thank you very much.

24            (Court in recess at 11:22 a.m.)

25

76

```
 1                    C E R T I F I C A T E

 2            I, Shawnie Archuleta, CCR/CRR, certify

 3    that the foregoing is a transcript from the record

 4    of the proceedings in the foregoing entitled matter.

 5            I further certify that the transcript fees

 6    format comply with those prescribed by the Court and

 7    the Judicial Conference of the United States.

 8            This 8th day of June 2022.

 9

10

11                          s/Shawnie Archuleta
                            Shawnie Archuleta CCR No. 7533
12                          Official Court Reporter
                            The Northern District of Texas
13                          Dallas Division

14

15

16    My CSR license expires:  December 31, 2022

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**